1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KENNETH G. JOHNSON,

11            Plaintiff,                    No. CIV S-01-1033 FCD PAN P

12        vs.

13   CAL A. TERHUNE, et al.,

14            Defendants.                   FINDINGS & RECOMMENDATIONS

15   _____/

16            Plaintiff is a state prison inmate proceeding pro se with a civil rights action

17   pursuant to 42 U.S.C. § 1983; the action proceeds on the May 24, 2001, verified complaint.

18                        FACTS AND PROCEDURAL BACKGROUND

19            Plaintiff alleges correctional officers at California Medical Facility in Vacaville

20   ("CMF") used excessive force on him on June 1, 2000, ultimately breaking a bone in his ankle.

21   He alleges that for fifteen days he did not receive any medical care for this broken bone or other

22   injuries caused by the excessive force.  Plaintiff claims that defendants violated his rights under

23   the Eighth Amendment first by using excessive force, then by acting with deliberate indifference

24   to his serious medical needs by failing to provide treatment for his broken ankle and other

25   injuries.  In addition, plaintiff alleges defendant Terhune and the Correctional Managed Care

26   Medical Corporation failed to train, supervise and discipline employees involved in the

altercation.  Plaintiff also raises pendent state law claims arising from the same set of facts.

On November 15, 2004, plaintiff filed a motion for partial summary judgment against all named defendants except Macias, Walters, CMCMC and Chapman, seeking judgment in his favor on liability.[1]  On March 22, 2005, defendants Cueva, Fisher, Mann, Gomez, Alegria, Hronek, Miller, Santana, Geraghty, Altcheck, Terhune, Arnold, Torres, Norris, and Allen filed a cross-motion for summary judgment seeking judgment in their favor on plaintiff's Eighth Amendment claims.[2]  Defendants also claim plaintiff has failed to exhaust his administrative remedies as to his claim against defendant Terhune and that the court should decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

In their cross-motion for summary judgment, defendants claim, for the first time, that plaintiff failed to exhaust his claims against defendant Terhune.  Specifically, defendants allege that plaintiff "never filed a grievance alleging conspiracy, retaliation or failure to train." (Defts.' Cross-Motion, filed March 22, 2005, at 7.)  Defendants further argue that plaintiff's "administrative appeal did not put defendant Terhune on notice that his actions gave rise to a potential claim."  (Id.)  Plaintiff disagrees.

The Prison Litigation Reform Act (PLRA) provides that

> [n]o action shall be brought with respect to prison conditions under section 1983 with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

---

[1]  Summary judgment against defendants Correctional Managed Care Medical Corporation and Nurse Chapman was denied by order filed September 23, 2005.  (Docket No. 224.)  Defendant Walters was dismissed from this action on November 30, 2004.  (Docket No. 156.)  Defendant Macias was dismissed from this action on March 11, 2005, as were defendants Young, Musick, Chimkey, Saucedo, Gonzalez, Johnson, Escobar and Cody.  (Docket No. 196.)

[2]  Defendant Livingston, deceased, was dismissed from this action on October 23, 2003. (Docket No. 76.)  Defendants Ross and Zepeda were dismissed by order filed July 25, 2005. (Docket No. 217.)  Defendant Massetti, aka Marretti, was granted summary judgment by order filed September 23, 2005.  (Docket No. 224.)

28 U.S.C § 1997e(a).  "Conditions of confinement" subject to exhaustion have been defined

broadly as "the effects of actions by government officials on the lives of persons confined in

prison."  18 U.S.C. § 3626(g)(2); Smith v. Zachary, 255 F.3d 446, 449 (7th Cir. 2001); see also

Lawrence v. Goord, 304 F.3d 198, 200 (2d Cir. 2002).  Exhaustion of such remedies is

mandatory.  Booth v. Churner, 532 U.S. 731, 741 (2001).

A motion to dismiss for failure to exhaust administrative remedies prior to filing

suit arises under Rule 12(b) of the Federal Rules of Civil Procedure.  Wyatt v. Terhune, 315 F.3d

1108, 1119 (9th Cir.), cert. denied sub nom. Alameida v. Wyatt, 540 U.S. 810 (2003).  In

deciding a motion to dismiss for a failure to exhaust non-judicial remedies, the court may look

beyond the pleadings and decide disputed issues of fact.  Id. at 1119-20.  Defendant bears the

burden of proving plaintiff's failure to exhaust.  Id. at 1119.

The California prison grievance procedure has several layers, culminating in the

third, or Director's, level review.  Cal.Code Regs tit. 15, §§ 3084.1- 3084.5.  Administrative

procedures generally are exhausted once a plaintiff has received a "Director's Level Decision," or

third level review, with respect to his issues or claims, unless a step of the grievance process is

not available to plaintiff.  Cal. Code Regs. tit. 15, § 3084.5.   In addition, to satisfy the exhaustion

requirement, a grievance must alert prison officials to the claims the plaintiff has included in the

complaint.  Porter v. Nussle, 534 U.S. 516, 524-25 (2002) (purpose of exhaustion requirement is

to give officials "time and opportunity to address complaints internally before allowing the

initiation of a federal case"); Brown v. Sikes, 212 F.3d 1205, 1209 (11th Cir. 2000) (1997e(a)

requires that a prisoner provide as much relevant information as he reasonably can in the

administrative grievance process); cf. Ngo v. Woodford, 403 F.3d 620, 631 (9th Cir. 2005)

(administrative remedy not "available" if grievance has been rejected as untimely despite prison

officials' discretion to accept late claims).

In his complaint, plaintiff alleges he exhausted his administrative remedies.

Defendants contend that a review of the records at Pelican Bay State Prison show that no appeal

1  was filed regarding any of the claims plaintiff alleges in his complaint.  Defendants further

2  contend that a review of the records at CMF reveal that plaintiff filed an inmate appeal on August

3  9, 2000 regarding denial of medical care and excessive use of force.  (DX 1 (Decl. Cry).  That

4  appeal was rejected as untimely.  (Id.)  Defendants state that plaintiff did not file an inmate

5  appeal regarding conspiracy, failure to train or retaliation by any of the named defendants.  (DX J

6  (Decl. Samples).)

7          Appended to plaintiff's declaration is his August 3, 2000 CDC 602 appeal form

8  where he describes the altercation of June 2, 2000 and the resulting failure to provide medical

9  care.  (Docket No. 210 at 20.)  Within that document plaintiff alerts prison officials to the

10  pending CDC-115 RVR and an I.R. # CMF-MCS-00-06-0255 that were reported from the

11  incident.  (Docket No. 210 at 23.)  Plaintiff informed them there was "not enough room to put all

12  the facts of these issues on one attached sheet.  This is a brief account."  (Docket No. 210 at 23.)

13  Plaintiff went on to allege that the officers failed to prevent the incident from occurring and

14  failed to intervene once other officers beat plaintiff.  (Id.)  Plaintiff stated that the:

15          supervisors are involved, too, some of these things I believe were
        motivated by retaliation in several aspects too.  Plus instigation,
16          conspiracy, fabrication and destruction of the evidence, too.
        Denial of medical treatment and/or adequate medical treatment,
17          negligence, malpractice, etc. known and unknown persons and
        supervisors are involved, failed to investigate, approved, condoned
18          and ratified, illegal policies, procedures, customs, supervision,
        discipline, training, hiring, retention, incompetence, negligence,
19          etc.  But the two main things I'm complaining about is the
        excessive force and denial of medical treatment.  There's not
20          enough room to put all the names down here.  The I.R. lists most of
        them.  Plus the doctors and MTAs, the Lts., Capts, Warden,
21          Director, the MCDC staff, too and their medical staff also.  Plus
        the RVR and IR was/is full of "lies" too.

22

23  (Docket No. 210 at 23.)  Although defendants contend that plaintiff's appeal was rejected as

24  untimely, the court notes that the first reason cited for its rejection was the "Action or Decision

25  being appealed is not within the jurisdiction of the department," next to which is written "Madera

26  County custody."  (Docket No. 210 at 24.)  Next to the portion marked "you have exceeded the

1   15 day time limit for submitting/resubmitting an appeal," is written in handwriting: "6-1-2000

2   Allegation of staff misconduct on CDC staff at CMF." (Docket No. 210 at 24.)

3          On August 20, 2000, plaintiff filed a request for Director's Level Review claiming

4   that "appeals coordinator at CMF 'M. Cry,' CC-II refuse[d] to process and forward this 602 for

5   informal and/or first formal level (or any level) response(s)." (Docket No. 210 at 25.) Plaintiff

6   objected that the incident he complained of occurred at CMF, even though some of the events

7   happened at the county jail, and confirmed that he had filed two previous 602's in this matter.

8   (Docket No. 210 at 25.) Plaintiff wrote that on June 8, 2000, he filed a 602 while he was in ad-

9   seg at CMF, but he did not receive a response back. (Docket No. 210 at 25.) Plaintiff then states

10  that on July 10, 2000 he sent a second 602 to CMF Inmate Appeals for which he also did not

11  receive a response, nor was it returned to him. (Docket No. 210 at 25.) Plaintiff reiterated his

12  602 appeal and asked the director to order the appeals coordinator to process his 602 and forward

13  it to the appropriate staff to get heard or have the director provide plaintiff a Director's Level

14  review and response. (Docket No. 210 at 25.)

15         On September 26, 2000, plaintiff's appeal was returned by Linda L. Melching,

16  Chief, Inmate Appeals Branch, with a letter stating plaintiff had "exhausted the administrative

17  remedy through CDC," and noted that an "appellant must submit the appeal within 15 working

18  days of the event or decision being appealed, or of receiving a lower level decision in accordance

19  with CCR 3084.6(c)." (Docket No. 210 at 26.)

20         Plaintiff has provided a declaration corroborating his efforts to exhaust

21  administrative remedies. (Pl.'s Decl., filed May 13, 2005, at 6-10 (Docket No. at 14-18).)

22         "The PLRA requires prisoners to exhaust all *available* administrative remedies

23  before filing a § 1983 claim in federal court. See 42 U.S.C. § 1997e(a)." Ngo v. Woodford, 403

24  F.3d 620, 625 (9th 2005). Even if a prisoner's grievance is rejected at the first level on the

25  ground it was untimely, if the prisoner's description of the problem gave the department fair

26  opportunity to resolve it, the prisoner has exhausted available administrative remedies. Because

plaintiff's appeal was deemed untimely, there were no administrative remedies left available to him.  Thus, plaintiff has exhausted his administrative remedies.  Ngo, 403 F.3d at 631. Moreover, it appears plaintiff made reasonable efforts to exhaust but was prevented from doing so by prison employees.  See, e.g., Rodriguez v. Hahn, 2000 WL 1738424 (S.D.N.Y. Nov.22, 2000); see also Miller v. Norris, 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)").

Plaintiff has demonstrated a good faith effort to exhaust his administrative remedies.  Plaintiff 's evidence is sufficient to overcome defendants' showing.  See Wyatt v. Terhune, 315 F.3d at 1120; cf. Ngo, 403 F.3d at 625.  The motion to dismiss for failure to exhaust by defendant Terhune should be denied.

CROSS-MOTIONS FOR SUMMARY JUDGMENT

The court now turns to the cross-motions for summary judgment.  Plaintiff seeks summary judgment on liability, alleging there is no genuine issue of material fact remaining on the issue of liability.  Defendants Cueva, Fisher, Mann, Gomez, Alegria, Hronek, Miller, Santana, Geraghty, Altcheck, Terhune, Arnold, Torres, Norris, and Allen seek summary judgment on the Eighth Amendment issues of excessive force and deliberate indifference to plaintiff's serious medical needs.  In the alternative, defendants argue they are entitled to qualified immunity.  Finally, defendants argue that the court should decline to exercise jurisdiction over plaintiff's state law claims.

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©.

Under summary judgment practice, the moving party

always bears the initial responsibility of informing the district court
of the basis for its motion, and identifying those portions of "the

1              pleadings, depositions, answers to interrogatories, and admissions
2              on file, together with the affidavits, if any," which it believes
demonstrate the absence of a genuine issue of material fact.

3  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the

4  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

5  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

6  to interrogatories, and admissions on file.'" Id.  Indeed, summary judgment should be entered,

7  after adequate time for discovery and upon motion, against a party who fails to make a showing

8  sufficient to establish the existence of an element essential to that party's case, and on which that

9  party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof

10  concerning an essential element of the nonmoving party's case necessarily renders all other facts

11  immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

12  whatever is before the district court demonstrates that the standard for entry of summary

13  judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

14        If the moving party meets its initial responsibility, the burden then shifts to the

15  opposing party to establish that a genuine issue as to any material fact actually does exist. See

16  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

17  establish the existence of this factual dispute, the opposing party may not rely upon the

18  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

19  form of affidavits, and/or admissible discovery material, in support of its contention that the

20  dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

21  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

22  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

24  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

25  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

26  1436 (9th Cir. 1987).

1        In the endeavor to establish the existence of a factual dispute, the opposing party

2  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

3  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

4  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

5  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

6  genuine need for trial.'"  Matsushita, 475 US. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

7  committee's note on 1963 amendments).

8        In resolving the summary judgment motion, the court examines the pleadings,

9  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

10  any. Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

11  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

12  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

13  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

14  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

15  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

16  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

17  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

18  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

19  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

20        On February 7, 2003, the court advised plaintiff of the requirements for opposing

21  a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

22  F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, ___U.S.___, 119 S. Ct. 2392 (1999);

23  Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

24                                    ANALYSIS

25  I.  Plaintiff's Motion for Summary Judgment

26        Initially, the court recognizes the yeoman's effort plaintiff undertook in presenting

his November 15, 2004 motion.  Although the motion and its supporting documents were voluminous (300 pages for the motion itself and several reams of paper in support thereof), plaintiff's filings were neatly written, clearly labeled and articulate.  The court appreciates the effort plaintiff has undertaken to assist the court in resolving this matter.

However, the court need not detail the facts for plaintiff's motion for summary judgment because material facts remain disputed.  First, the court notes that at the time plaintiff filed his motion for summary judgment, the parties were still engaged in discovery.  In addition, various defendants have been dismissed as noted above and two defendants have been denied summary judgment.  Moreover, it is the rare case where a plaintiff will be granted summary judgment on liability.

In order for plaintiff to obtain summary judgment against defendants on the issue of excessive force, plaintiff must establish all the elements that demonstrate the use of force was excessive.  "The Hudson Court laid out five factors to be considering in making this determination: (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.  Id. at 7."  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  Plaintiff has not demonstrated each of these elements and thus may not be awarded summary judgment on liability.

Moreover, plaintiff's motion for summary judgment against Dr. Geraghty and Dr. Altcheck does not establish the elements of a deliberate indifference case to the required degree of certainty.

Deliberate indifference is proved by evidence that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 825, 837 (1994).

1    Plaintiff complains about the medical care he did receive as well as the medical

2   care he claims he did not receive.  The videotape filed by plaintiff on November 29, 2004

3   demonstrates that Dr. Geraghty examined plaintiff's foot.  Dr. Geraghty concluded plaintiff had a

4   soft tissue injury.  (Id.; see also Defts.' Statement of Undisputed Facts ("SUF") at 4-5, ¶¶ 20-22.)

5   It is undisputed that Dr. Geraghty did not order an x-ray at that time.  Plaintiff may not agree with

6   the examination and treatment he received from Dr. Geraghty, but the fact that plaintiff's ankle

7   turned out to be broken does not, by itself, entitle plaintiff to summary judgment on the issue of

8   liability.

9    Plaintiff has similarly failed to meet the elements of deliberate indifference with

10  regard to Dr. Altcheck.  Dr. Altcheck maintains that at no time did plaintiff indicate his foot was

11  broken and needed to be x-rayed.  (Defts.' SUF at 6, ¶ 29.)  Plaintiff, on the other hand, states he

12  "immediately explained, several times, to CMF defendant Altcheck that he was in a lot of pain,

13  that his left ankle/foot was broken and needed to be x-rayed and examined by a doctor."  (Pl.'s

14  SUF at 110, ¶ 387.)  Plaintiff declares that despite his repeated requests for medical treatment for

15  his broken ankle, defendant Altcheck refused to even look at plaintiff's ankle or foot, let alone

16  examine or x-ray it.  (Id. at ¶ 389.)  These facts represent a material dispute of fact, which must

17  be decided by a jury rather than on motion for summary judgment.

18    For all of the above reasons, this court recommends that plaintiff's November 15

19  2004 motion for partial summary judgment on liability be denied.

20  II.  Defendants' Cross-Motion for Summary Judgment

21    A.  Undisputed Facts

22    On March 22, 2005, defendants filed their statement of undisputed facts.  On May

23  13, 2005, plaintiff incorporated defendants' statement and numbering system, noting which facts

24  he agreed were undisputed and which facts he argues are disputed.  The court has noted those

25  numbers which are disputed, retaining the numbering system used by the parties.

26    1.  Plaintiff is an inmate properly confined by the California Department of

Corrections following his conviction for attempted murder in the first degree, killing of an animal and evading a peace officer.

2.   The incidents alleged in the complaint as to defendants Cueva, Fisher, Mann, Gomez, Alegria, Hronek, Miller, Santana, Geraghty, Altcheck, Arnold, Torres, Norris, and Allen occurred at the California Medical Facility ("CMF") in Vacaville, California.

3.   Defendant C. Terhune was the Director of the California Department of Corrections ("CDC") at the times relevant herein.

4.   Defendants E. Arnold and S.L. Norris were Correctional Lieutenants and B. Torres was a Visiting Correctional Lieutenant at CMF at the times relevant herein.

5.   Defendants M. Fisher, S. Allen and D. Cueva were Correctional Sergeants at CMF at times material to the matters at issue.

6.   Defendants F. Mann, M. Gomez, J. Alegria, M. K. Hronek and W. Miller were Correctional Officers at CMF at times material to the matters at issue.

7.   Defendant G. Santana was a Correctional Officer assigned to the Northern Transportation Unit at times material herein.

8.   Defendants J. Geraghty[3] and M. Altcheck were physicians at CMF at times material to the matters at issue herein.

9.   Plaintiff  was medically cleared for transport on May 31, 2000.  The medical records indicate that plaintiff complained of being cold and that plaintiff was confrontational with the Medical Technical Assistant ("MTA").[4]

10.  On June 1, 2000, plaintiff was being transported from Pelican Bay State Prison ("PBSP") to Madera County for a court appearance on June 2, 2000.

---

[3] On March 2, 2006, Connie Geraghty was substituted for Dr. J. Geraghty, who is deceased.  The court refers to this defendant as Dr. Geraghty for purposes of this motion.

[4] Although plaintiff agrees that the medical records contain this information, plaintiff disputes this information as incomplete and inaccurately written by the MTA.

11.  Arrangements had been made from Madera County to take control of plaintiff at CMF.  Prior to the scheduled prisoner exchange, Officer Mann was informed that plaintiff had caused problems for the Madera County officers in the past.  As a precautionary measure, Officer Mann instructed the Madera County Transport Team to change restraints on plaintiff immediately upon his exit from the bus.  Additionally, Officer Mann gave Madera County Officer Escobar a canister of O.C. pepper spray.[5]

12.  Once plaintiff exited the bus, he informed officers that he needed to use the restroom prior to making the trip to Madera County.  Madera County Officer Johnson told plaintiff, "Use it now, cause you can't use it later."  After assuring Officer Mann that plaintiff could be brought safely into receiving and release ("R & R"), Officer Santana, along with Madera County Officers Johnson and Escobar, escorted plaintiff to a holding cell.  Officer Santana then removed the mechanical restraints that belonged to the Northern Transportation Unit and stepped away from the holding cage.[6]

13.  Plaintiff disputes this fact.  Although plaintiff admits he punched Officer Johnson in the jaw, he claims he did so in self-defense.  (Pl.'s SUF ¶ 50.)

14.  Plaintiff disputes this fact.

15.  An officer activated the alarm and Sgt. Fisher called for assistance via the institutional radio.[7]

16 - 22.  The facts surrounding the ensuing altercation are disputed by plaintiff.

23.  Dr. Geraghty examined and cleared Officers Johnson and Escobar.  Officer

[5]   Although plaintiff agrees that this is the information written in the reports, plaintiff disputes this information as inaccurate, incomplete and not in the chronological order of the events as they happened.

[6]   Although plaintiff agrees that this is the information written in the reports, he disputes this information as inaccurate, incomplete and not in the chronological order of the events as they happened.

[7]  Plaintiff contends Officer Mann activated the alarm.  Defendants contend Officer Santana activated the alarm.

Johnson had a contusion to the right supra orbital and to the left lateral jaw, consistent with being assaulted.  Officer Escobar complained of pain to the right eye, and that he had been struck with plaintiff's elbow.  There was swelling, right eye contusion, and an abrasion to the right elbow.  Both Officers Johnson and Escobar were decontaminated, given ice packs and referred to their personal care providers.[8]

24.  In addition, Officer Allen suffered an injury to the lower back and went to the hospital for emergency treatment.

25.  Once plaintiff was medically cleared for transport, he was taken back to R&R, given a meal and water, and then escorted to the transport van.  Plaintiff was then transported to Madera County for his court appearance.

26.  Plaintiff disputes these facts.

27.  On June 2, 2000, plaintiff was returned to CMF.  Upon his arrival, plaintiff was examined in the B-1 clinic by Dr. Turner, a staff psychiatrist.  Dr. Turner noted plaintiff was not suicidal.  Plaintiff explained that he had gotten into an incident during transport to court, his overall mood was "fine."

28-29.  Plaintiff disputes these facts.

30.  While housed in the Willis Unit, plaintiff was monitored every hour.  The segregation log has no notations that plaintiff requested medical care, or that he complained of being in pain.  The log does show that plaintiff was able to shower and, on at least one occasion after being approved for walk alone yard on June 9, 2000, was able to go out to yard.[9]

31.  The unit log book indicates that medical staff were routinely on the unit.  The

---

[8] Plaintiff disputes the chronological order of this entry as he claims Officers Johnson and Escobar were treated before Dr. Geraghty examined and treated plaintiff.  Plaintiff disputes the language that any of the officers were "assaulted," arguing that plaintiff was the victim in this incident.

[9] Plaintiff agrees that these facts are undisputed as to what is written and not written in the logs, but argues that the information contained therein is inaccurate and incomplete.  (Pl.'s SUF ¶¶ 393, 394, 398, 401-07; and Ex. LLLL, ¶¶ 5-15; Pl.'s Decl. #2.)

1  isolation log book shows that on June 10, 2000, plaintiff was able to go to the law library.[10]

2        32.   Plaintiff was transported back to Pelican Bay on June 13, 2000.

3        33.   Upon his arrival, plaintiff was medically screened by MTA Holden.   Under

4  the section of the form indicating medical or dental problems, the MTA noted that plaintiff

5  complained of a "bad foot."[11]

6        34.   Plaintiff did not receive any subsequent medical care with regard to his foot

7  until June 16, 2000.   Plaintiff was seen by Nurse Breen, who noted that his foot was "hurt" in an

8  altercation with officers.   Plaintiff stated that no CDC-7219 was completed, but that he was given

9  an ace wrap.   Plaintiff also stated that the pain had gotten progressively worse.   Nurse Breen

10  noted that plaintiff's left ankle was swollen and painful to the touch.   However, plaintiff was able

11  to walk on his foot, and no difficulty walking was noted.[12]

12        35.   An hour later, plaintiff was seen again.   The nurse noted that plaintiff had

13  some bruising around the left ankle and left heel.   An x-ray indicated a fracture of the left fibula

14  and possible distal tibial area.   Plaintiff was then examined by Dr. Ibrahim, who noted that

15  plaintiff had limited range of motion in the left leg.   A fiberglass splint was placed on the ankle,

16  and plaintiff was given crutches for four weeks.[13]

17        36.   On June 21, 2000, Johnson was seen by Dr. Duncan for an orthopedic

18  consultation.   Dr. Duncan noted no deformity of the ankle and no visible soft tissue swelling.   X-

19  rays showed a non-displaced fracture of the distal fibula.   The doctor recommended application

---

[10]  Plaintiff agrees that it is undisputed what was written and not written in the log books, but argues the logbooks are inaccurate and incomplete.  PSUF ¶¶ 393, 394, 398, 401-07; Ex. LLLL, ¶¶ 5 - 15, Pl.'s Decl. #2.

[11]  Plaintiff states this fact is undisputed in part.  He disputes it as incomplete, citing PSUF ¶¶ 408 and 409.

[12]  Plaintiff states these facts are undisputed in part.  He disputes them as incomplete and not fully accurate, citing PSUF ¶¶ 408-11; Ex. LLLL, ¶¶ 16-22, Pl.'s Decl. #2.

[13]  Plaintiff claims these facts are undisputed in part.  He disputes them as incomplete and not in chronological order of events, citing PSUF ¶¶ 411-15.

1  of a non-weight bearing cast and the use of crutches.[14]

2          37.  Plaintiff's ankle was x-rayed again.  The x-rays showed that plaintiff's ankle

3  was healing, but not healed.  Dr. Babbit recommended follow-up.[15]

4          38.  On August 8, 2000, plaintiff was again seen by Dr. Duncan.  Dr. Duncan

5  noted that plaintiff was out of the cast and his ankle felt as though it were healing, and the pain

6  was diminished.  There was no deformity or swelling.  X-rays taken on July 26, 2000, showed

7  healing across the distal fibula with normal anatomic alignment of the fracture.[16]

8          39.  On December 26, 2000, a disciplinary hearing was held regarding plaintiff's

9  battery on Officer Johnson.  Plaintiff pled not guilty to the charge.  Plaintiff claimed he was

10  acting in self-defense when he struck Officer Johnson.  The hearing was postponed until Officer

11  Johnson could be present via teleconference.[17]

12          40.  On January 8, 2001, the disciplinary hearing was reconvened with Officer

13  Johnson present.  Officer Johnson testified that after plaintiff used the restroom, he gestured for

14  plaintiff to move toward the back wall for a pat down search.  Plaintiff then stepped out of the

15  cell and used his right hand to strike Officer Johnson.[18]

16          41-42.  No party's statement contained a number 41 or 42.

17

18  ———————————

19  [14]  Plaintiff states these facts are undisputed in part, but disputes as incomplete, citing
   PSUF ¶¶ 416.

20  [15]  Plaintiff states these facts are undisputed in part, but disputes them as incomplete and
   as to the date the x-ray was taken.  Defendants state the x-ray was taken on July 31, 2000.
21  Plaintiff contends his foot was x-rayed on July 26, 2000 when plaintiff saw Dr. Duncan again,
22  and the x-ray was read on July 31, 2000.  PSUF ¶ 417.

23  [16]  Plaintiff states these facts are undisputed in part, but disputes them as incomplete and
   not fully accurate, citing Pl.'s SUF ¶¶ 418-24.

24  [17]  Plaintiff states these facts are undisputed in part, but disputes them as incomplete and
25  not fully accurate, citing Pl.'s SUF ¶¶ 432-37.

26  [18]  Plaintiff states these facts are undisputed in part, but dispute them as incomplete and
   not fully accurate, citing Pl.'s SUF ¶¶ 432-37.

43.  Plaintiff was found guilty of battery on a peace officer.

44.  Plaintiff disputes the facts concerning exhaustion of administrative remedies.

B.  Plaintiff's Claims

1.  Eighth Amendment:  Excessive Force Claims

Plaintiff claims that on June 1, 2000, defendants Santana, Allen, Gomez, Alegria, Hronek, Miller, Cueva, Johnson and Escobar used excessive force against plaintiff in violation of his rights under the Eighth Amendment.  Defendants Cueva, Fisher, Mann, Gomez, Alegria, Hronek, Miller, Santana, Arnold, Torres, Norris, and Allen seek summary judgment on this claim on the grounds that (1) plaintiff's claim of excessive force is supported by neither the facts nor the law and (2) each of them is entitled to qualified immunity.

a.  Legal Standards

The use of excessive force by a prison official violates the Eighth Amendment. Hudson v. McMillian, 503 U.S. 1 (1992).  Determining whether there has been an Eighth Amendment violation turns upon " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' "  See id. at 6 (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).

To determine whether the use of force violates the Eighth Amendment, the court should consider the "extent of injury . . ., the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful  response.'" Hudson, 503 U.S. at 7 (quoting Whitley, 475 U.S. at 321); see also LeMaire v. Maass, 12 F.3d at 1454 (considering need for application of measure or sanction complained of, relationship between need and measure or sanction used, extent of any injury inflicted and extent of surrounding threat to safety of staff and inmates); Spain v. Procunier, 600 F.2d 189, 195 (9th Cir.1979) (guards may use force only in proportion to need in each situation).

" 'Prison administrators . . . should be accorded wide-ranging deference in the

adoption and execution of policies and practices that in their judgment are needed to preserve

internal order and discipline and to maintain institutional security.' " Whitley, 475 U.S. at 321-22

(quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)).   That deference extends to prophylactic or

preventive measures intended to reduce breaches of prison discipline.  Id.  But see McRorie v.

Shimoda, 795 F.2d 780, 784 (9th Cir. 1986) (describing circumstances in which the prison

official's use of force was constitutionally excessive).

　　　　　A two-part test applies to analysis of the qualified immunity defense.  Martinez v.

Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003) (citing Saucier v. Katz, 533 U.S. 194, 201-02

(2001).  First, the court looks at "whether the facts alleged 'show [that] the officer[s'] conduct

violated a constitutional right," and second, "whether the constitutional right in question was

'clearly established' such that 'it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted.'"  Martinez, id. (quoting Saucier, 533 U.S. at 201-02.)

　　　　　　　　b.  Disputed Facts

　　　　　First, it is undisputed that plaintiff struck Officer Johnson.  (Pl.'s SUF ¶ 50.)  It is

undisputed that Officer Escobar grabbed plaintiff from behind.  (Pl.'s SUF ¶ 52.)  At this point,

the parties' description of what happened diverges.  Plaintiff maintains he was totally submissive

when Officer Johnson placed plaintiff in a headlock and ran him toward the sallyport area.  (Pl.'s

SUF ¶ 54-55.)  Plaintiff states Officer Escobar then excessively sprayed plaintiff with pepper

spray all over plaintiff's body.  (Pl.'s SUF ¶ 56-57.)  It is undisputed that an officer activated the

alarm and Sgt. Fisher called for assistance via the institutional radio.[19]  Plaintiff contends Officer

Johnson ran plaintiff's head into the sallyport gate twice.  (Pl.'s SUF ¶ 60.)  Defendants state

Officer Johnson placed plaintiff in a headlock and the two ran into the sallyport gate.  (Defts.'s

SUF ¶ 16.)

　　　　　It is undisputed that Officers Gomez, Hronek, Alegria and Miller arrived and

_____

[19]  Plaintiff contends Officer Mann activated the alarm.  Defendants contend Officer
Santana activated the alarm.

attempted to bring plaintiff under control.  (Pl.'s Resp. to DSUF at 8.)

The parties disagree about what happened next.  Defendants contend plaintiff fell to the floor and Officers Johnson and Escobar landed on top of him.  (Defts.' SUF ¶ 16.)  Defendants allege that even after plaintiff was taken to the ground, he continued to resist by "kicking and thrashing about."  (Defts.' SUF ¶ 17.)  Defendants contend the following occurred:

> Officer Gomez grabbed [plaintiff's] right wrist and placed it into mechanical restraints.  Once secured, Gomez grabbed [plaintiff's] left hand and finished placing him into handcuffs.  Officer Hronek grabbed [plaintiff's] left calf with both hands while Officer Alegria grabbed [plaintiff's] right calf.  Sergeant Cueva handed leg irons to Officer Hronek, who was able to apply them to [plaintiff's] legs.  Sergeant Zapeda ordered that a spit mask be placed on [plaintiff's] head, and told [plaintiff] that if he stopped resisting, he would be placed on his side, making it easier for him to breathe.  [Plaintiff], who was weighed down by the officers, ceased resisting.  Staff then placed [plaintiff] on his right side.  A gurney was brought to R&R.  [Plaintiff] was strapped to the gurney, and wheeled to the B-1 clinic.

(Defts.' SUF ¶ 18.)

Plaintiff disputes these facts as "incomplete, inaccurate and not credible."  (Pl.'s Resp. to DSUF ¶ 18, citing Pl.'s SUF ¶¶ 70-131 and 433.)  Plaintiff describes the events as follows:

While plaintiff was still in Officer Johnson's headlock, someone plaintiff believes was defendant Allen, grabbed plaintiff's ankles and lifted them off the floor, causing plaintiff to fall face first onto the concrete, and several officers landed on top of plaintiff.  (Pl.'s SUF ¶ 69.)  Plaintiff was then lying on the sallyport floor on his stomach where plaintiff contends he was no longer resisting.  (Pl.'s SUF ¶ 70.)  Plaintiff believes defendants Santana, Allen, Gomez, Alegria, Hronek, Miller, Cueva, Johnson and Escobar then attacked plaintiff while he was subdued and unresisting on the floor.  (Pl.'s SUF ¶ 70.)  Plaintiff declares these officers were

> punching plaintiff with closed fists, kicking and stomping on him all over his body, facial area, head, back, legs and feet.  Plaintiff then felt and heard his left ankle bone(s) snap, causing excruciating pain.  Plaintiff knew his leg had just been stomped on causing it to break by those officers.

(Pl.'s SUF ¶ 70.)  Plaintiff states these officers continued to beat him while he lay unresisting on the floor for an additional one to two minutes before the officers handcuffed his wrists behind his back and leg-ironed his ankles.  (Pl.'s SUF ¶ 71.)  Then a black hood was placed on plaintiff's head, which plaintiff argues made it harder for him to breathe due to the O.C. Pepper Spray applied earlier.  (Id.)  Plaintiff contends that after he was placed in restraints, while laying prone on the floor and not resisting, at least 7 to 10 officers were standing on plaintiff's head, back, shoulders, legs and feet.  (Pl.'s SUF ¶ 126.)  About ten minutes later, plaintiff states, defendants put plaintiff on a gurney.  (Pl.'s SUF ¶ 127.)

c.  <u>Analysis</u>

The court has reviewed the evidence submitted by plaintiff and defendants.  It appears plaintiff claims defendants Santana, Allen, Gomez, Alegria, Hronek, Miller, Cueva, Johnson and Escobar used excessive force against him.  The evidence reflects that defendants Arnold, Norris, Fisher and Mann were witnesses, but did not use force against plaintiff.  (Defts.' Ex. B at 7, 63-65, 36-40, 21-22.)  In addition, although plaintiff "believes" defendant Cueva was one of the officers who "attacked" him, the evidence reflects that defendant Cueva's participation was limited to handing restraints to defendant Hronek.  (Defts.' Ex. B at 26-27.)  Defendant Torres was the officer who handled the post-use of force video and was not involved in the instant altercation at all.  Accordingly, to the extent that plaintiff's complaint alleged excessive force claims against defendants Arnold, Norris, Fisher, Mann, Torres and Cueva, those claims should be dismissed.

Insofar as the remaining defendants, although plaintiff contends he was not resisting, many of the officers noted his resistance in reports filed subsequent to this incident. Defendant Santana claims plaintiff was "still struggling and resisting."  (Pl.'s SUF ¶ 74) Defendant Allen admits he observed defendant Escobar "trying to control plaintiff."  (Pl.'s SUF ¶ 80)  Defendant Hronek admits he saw plaintiff "involved in a physical altercation with custodial staff."  (Pl.'s SUF ¶ 86.)  Defendant Gomez observed plaintiff "struggling, kicking and thrashing

1   about while officers . . . tried to subdue him." (Pl.'s SUF ¶ 92 & 93.) Defendant Alegria admits

2   he observed plaintiff in a "physical altercation with MCDC defendant Johnson." (Pl.'s SUF ¶

3   95.) Defendants also contend that plaintiff continued to resist even after mechanical restraints

4   were applied. (Defts.' Ex. B.)

5           On the other hand, defendant Miller stated that when he saw the officers on top of

6   plaintiff, holding plaintiff down, plaintiff was not resisting at that time. (Pl.'s SUF ¶ 103.)

7   Defendant Fisher admitted that he wrote in his June 1, 2000 report that " it appeared plaintiff []

8   stopped resisting when CMF correctional staff arrived in the R&R sally port area." (Pl.'s Ex. T.)

9   Defendants dispute that statement as incomplete, clarifying that "prior to responding staff

10  arriving in R & R, it did not appear that plaintiff was under control.  Plaintiff appeared to stop

11  resisting only after additional staff arrived." (Defts.' Resp. to Pl.'s SUF 110. at 25.)  But even if

12  plaintiff stopped resisting when the additional staff arrived, physical force was not required and

13  the acts of those additional staff jumping on plaintiff could be viewed by a jury as excessive.

14          While the parties dispute whether plaintiff continued to resist, it is undisputed that

15  the officers used physical force to restrain plaintiff.

16          In considering an excessive force claim, the court must look to those Hudson

17  factors set forth above.  Because this requires sifting through disputed factual contentions, and to

18  draw inferences therefrom, summary judgment in this excessive force context is inappropriate.

19  To defeat summary judgment, plaintiff must show that a reasonable jury could have found that

20  the officers' use of force was excessive.  See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998).

21  In addition to his own declaration concerning the events in question, plaintiff has pointed to the

22  conflicting versions of what happened among the defendants while plaintiff was in the sallyport

23  area.  If plaintiff's version of the facts are believed, a reasonable jury could find the defendants'

24  use of force was excessive.  Triable issues exist regarding these remaining defendants' perceived

25  need to physically restrain plaintiff who was involved in an altercation with, at a minimum,

26

1    Officer Johnson, who is no longer a defendant in this case,[20] either once plaintiff arrived in the

2    sallyport or after plaintiff was taken to the ground in the sallyport.

3            Defendants argue that they tempered their use of force because Officer Mann had

4    been informed that plaintiff had caused problems for Madera County officers in the past and that

5    Officer Mann had made arrangements for Madera County officers to take immediate control of

6    plaintiff.[21]  In addition, Officer Mann gave Officer Escobar a canister of pepper spray in case

7    plaintiff proved problematic.  (Motion at 10.)  In addition to these precautionary measures

8    defendants contend they used holds and their body weight to control plaintiff and that Sgt.

9    Zapeda attempted to reason with plaintiff, finally getting him to cease his resistance.  (Motion at

10   10.)

11           However, in the Manager's Review of the Use of Force form, dated July 11, 2000,

12   Captain Evans stated that not all reasonable steps were taken to minimize the need for or level of

13   force used.   (Defts.' Ex. B, at 84.)  Captain Evans noted the overall inconsistencies in the initial

14   reports about who was present and/or responded, when they were involved, who helped take the

15   inmate to the floor and how it was accomplished, and what role the reporting staff played in the

16   incident.  (Defts.' Ex. B at 87-88 (see bulleted points highlighting inconsistencies).)  An analyst

17   who signed an Executive Review of Use of Force Critique and Qualitative Evaluation Analysis,

18   dated October 6, 2000, noted the initial reports were incomplete and stated clarification reports

19   were necessary.  (Defts.' Ex. B at 93-96; 94.)  The analyst also found that staff actions prior to

20   the use of force were not in compliance with departmental standards and policy.  (Id.)

21           In response to the question "were staff actions during the use of force in

22   compliance with departmental standards and policy," the analyst responded:  "The reports do not

23   _____

24        [20]  Both Officer Johnson and Officer Escobar were dismissed from this action on March
     11, 2005.

25        [21]  These precautionary measures were diminished, however, when officer Santana
26   removed plaintiff's restraints before he was secured in the holding cell and Officer Johnson
     ordered plaintiff out of the holding cell before plaintiff was placed back into restraints.  (See
     Santana's answers to questions posed during the investigation, Defts.' Ex. B at 46-47.)  Plaintiff
     argues this lapse violated institutional policy.

1   indicate that staff used verbal persuasions in attempt to get inmate Johnson to stop resisting.

2   Staff used physical strengths and holds to subdue the inmate.  This physical force was the

3   minimum amount necessary to subdue an attacker.  Based on staff reports, when Officer Escobar

4   dispensed the OC spray it was done incorrectly, as the spray went into the direction of Officer

5   Santana." (Defts.' Ex. B, at 95.)

6           Taking plaintiff's allegations as true, the alleged force in the form of kicking,

7   punching and stomping on plaintiff's head, legs and feet, ultimately breaking plaintiff's ankle,

8   was not minimal intrusion.  See Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,

9   1134-35 (9th Cir.2000), vacated by County of Humboldt v. Headwaters Forest Def., 534 U.S.

10  801 (2001) (a jury could find that the severity of intrusion by pepper spray alone was more than

11  minimal).[22]  But see Jackson v. City of Bremerton, 268 F.3d 646, 653(9th Cir.2001) (concluding

12  that an intrusion was minimal despite the arrestee's broken finger and irritated eyes).

13          In the instant case, there are genuine issues of material fact in dispute that

14  preclude the grant of summary judgment.  See Lolli v. County of Orange, 351 F.3d 410 (9th Cir.

15  2003)(quoted citation omitted) (disputed issues of material fact precluded entry of summary

16  judgment on pretrial detainee's excessive force claims).

17          Finally, the parties dispute the extent of injury suffered by plaintiff.  Defendants

18  contend Dr. Geraghty "noted only superficial puncture wounds to his hands and head," (Motion

19  at 11), and argue that the initial x-ray showed no dislocations or fractures and that plaintiff was

20  not diagnosed with the fracture of the left distal fibula until two weeks after the incident.

21  (Motion at 11.)  Plaintiff argues that he suffered a broken ankle which caused him excruciating

22  pain.

23          Because of the factual disputes plaintiff has identified, the individual officers

24  whose motions for summary judgment this court recommends denying also should not be entitled

25  to summary judgment based upon qualified immunity.  See Santos v. Gates, 287 F.3d 846, 855 n.

26

----

[22]  The excessive force holding in Headwater remains good law, notwithstanding that the opinion was vacated and the case remanded.  See Santos, 287 F.3d at 855 n.11.

12 (9th Cir.2002) (declining to grant qualified immunity "because whether the officers may be said to have made a 'reasonable mistake' of fact or law, may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom" (citation omitted)); see also Martinez v. Stanford, 323 F.3d 1178, 1184-85 (9th Cir.2003) (the "facts in dispute bearing on the question of qualified immunity" made summary judgment on that ground inappropriate).  If plaintiff's version of the facts ultimately prevails, there is a reasonable likelihood that the officers would not be entitled to qualified immunity.  See Felix v. McCarthy, 939 F.2d 699, 701-02 (9th Cir.1991) (by 1985, the law of this circuit would have put reasonable officers on notice that an "unprovoked and unjustified attack by a prison guard" violated clearly established constitutional rights).

Accordingly, the motion for summary judgment on plaintiff's excessive force claim is denied as to defendants Gomez, Alegria, Hronek, Miller, Santana, and Allen.

2.  Eighth Amendment:  Medical Claims

Defendants contends that medical records demonstrate that plaintiff received medical care and that plaintiff's claims against Dr. Geraghty and Dr. Altcheck represent a mere difference of opinion as to the type of medical care provided, thus failing to demonstrate deliberate indifference to plaintiff's serious medical needs.  Plaintiff contends both Dr. Geraghty and Dr. Altcheck were deliberately indifferent to his serious medical needs and has provided a declaration by Corey Weinstein, M.D. in support of his claims.  (Pl.'s Ex. C.)

a.  Legal Standards

In order to prevail on his Eighth Amendment claim, plaintiff must prove that he had a "serious medical need" and that defendants acted with "deliberate indifference" to that need.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  A medical need is serious if  "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' "  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir.1992) (quoting Estelle, 429 U.S. at 104, 97 S.Ct. 285).  Deliberate indifference is proved by evidence that a prison official "knows of and disregards an excessive risk to inmate health or safety; the official

1   must both be aware of the facts from which the inference could be drawn that a substantial risk of

2   serious harm exists, and he must also draw the inference."   Farmer v. Brennan, 511 825, 837

3   (1994).   Mere negligence is insufficient for Eighth Amendment liability.   Frost v. Agnos, 152

4   F.3d 1124, 1128 (9th Cir. 1998).   "Prison officials are deliberately indifferent to a prisoner's

5   serious medical needs when they deny, delay, or intentionally interfere with medical treatment."

6   Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks

7   omitted).

8                                      i.   Dr. Geraghty

9            Medical records demonstrate plaintiff was examined first by an MTA, then by Dr.

10   Geraghty.   (Defts.' Ex. C at 3.)   Although defendants contend Dr. Geraghty examined plaintiff's

11   foot twice, the June 1, 2000 report signed by Dr. Geraghty does not reflect an examination of

12   plaintiff's foot during the first exam.   (Defts.' Ex. C at 3.)   It is undisputed that Dr. Geraghty did

13   not remove plaintiff's shoe and sock until a second examination was videotaped in the post use

14   of force video.[23]   During that video, Dr. Geraghty is quite ginger in his "examination" of plaintiff,

15   and a jury must decide whether his conclusion that plaintiff was "able to raise and lower the foot,

16   wiggle his toes and had range of motion" is credible.   Plaintiff was complaining of severe pain in

17   his ankle/foot area, but Dr. Geraghty was quick to determine it was a mere soft tissue injury,

18   without benefit of an x-ray to support his finding.   Moreover, it is evident from the video that Dr.

19   Geraghty did not examine plaintiff's back, as plaintiff remained clothed in his jumpsuit, despite

20   plaintiff's repeated complaints that his back had been injured in the altercation and that his

21   jumpsuit was soaked with pepper spray.

22            Plaintiff's expert, Dr. Weinstein, supports plaintiff's view of the care received:

23            [Plaintiff] describes that his foot feels broken, something is wrong
              with his low back, and that he didn't get decontaminated

24            adequately, and requests examination and care for each complaint.
              The video records abrasions on his forehead, scalp and fifth

25

26
_____

[23]   Plaintiff contends that Dr. Geraghty only performed the second examination after
conferring with Lt. Torres and Sgt. Allen, stating "He's too smart, I had better go back and look
at his foot, at least for the camera's sake."   (Pl.'s Ex. A, at 16-17, ¶ 54.)

fingers.  It appears that the white coated Dr. Geraghty is standing nearby.  The doctor takes off [plaintiff's] sneaker and must cut off the sock due to cries of pain on any motion of sock removal.  Dr. Geraghty asks [plaintiff] to wiggle his toes and there is little apparent movement.  There is obvious swelling on video of the lateral malleolus, and exquisite tenderness on touch of the lateral malleolus, and [plaintiff] describes burning at that site.  The doctor says he will do passive range of motion, but little if any is accomplished.  The ankle is held in mild flexion and internal rotation during the examination and movements by the patient.  The doctor asks [plaintiff] to dorsiflex the foot and little if any motion is seen on the video.  The doctor does not examine the back, and says he is satisfied with decontamination and advises staff to not cut off clothes of [plaintiff] for their own safety.

(Pl.'s Ex. C at 3.)  Dr. Weinstein opined that "[s]igns of exquisite malleolar tenderness and malleolar swelling with limited range of motion and inability to actively move along with the symptom of burning pain and exquisite pain on trivial motion are classic signs of fracture."  (Id.)

        While Dr. Weinstein finds Dr. Geraghty's treatment negligent, he goes on to find Dr. Geraghty's refusal to remove plaintiff's pepper-sprayed clothing to apply proper water decontamination prejudicial in that plaintiff had become calm and compliant.  (Id.)  Dr. Weinstein found Dr. Geraghty's instructions to "take it easy on it," to be "an abusive and negligent recommendation."  (Id.)

        In addition, plaintiff contends that the video camera was shut off around 7:47 p.m. and that he argued with Dr. Geraghty about his broken ankle, telling Dr. Geraghty he knew what broken bones felt like and his foot was on fire and extremely painful, yet Dr. Geraghty responded by saying "we're not going to x-ray it."  (Pl.'s Decl., Ex. A, at 20, ¶ 66-67.)

        This court finds there are genuine issues of material fact as to whether defendant Dr. Geraghty was deliberately indifferent to plaintiff's serious medical needs.  Thus, defendants' motion for summary judgment as to defendant Geraghty should be denied.

                ii.  Dr. Altcheck

        On June 2, 2000, while plaintiff was in Madera County custody, his foot was x-rayed and showed no fracture of dislocation.  (Defts.' Ex. C at 5.)  Plaintiff was returned to CMF

on that date and was taken by wheelchair to the B-1 Clinic where Dr. Turner, a staff psychiatrist, asked plaintiff if he was suicidal, plaintiff responded he was not.  (Defts.' Ex. C at 6; Pl.'s Ex. A, at 33.)  Dr. Turner noted that plaintiff stated he had been out for court and got in an incident during transport to court.  (Id.)  Plaintiff stated Dr. Turner told him he was cleared for ad-seg.  (Pl.'s Ex. A at 33.)

Plaintiff was then taken to Dr. Altcheck who called Pelican Bay and spoke to pharmacist P. Neville, who confirmed plaintiff's current medicines.  (Defts.' Ex. C at 8.)  Dr. Altcheck ordered plaintiff's medications and then wrote a note stating plaintiff was "medically cleared for Willis."  (Defts.' Ex. C at 9.)  There are no medical records reflecting that Dr. Altcheck examined plaintiff.  Plaintiff states that after Dr. Altcheck told plaintiff he was cleared for ad-seg, plaintiff "immediately explained, several times, . . . that [he] was in a lot of pain, that [his] left ankle/foot was broken and needed to be x-rayed and examined by a doctor, [his] ankle had a wrap on it, [plaintiff] was in a wheelchair, [his] toes were sticking out and clearly purplish and swollen up."  (Pl.'s Ex. A at 33-34.)  Plaintiff further contends that despite his repeated requests for medical treatment, Dr. Altcheck refused to even look at plaintiff's foot/ankle, x-ray it or examine it.  (Pl.'s Ex. A at 34.)

Defendant Dr. Altcheck maintains that at no time did plaintiff indicate his foot was broken or needed to be x-rayed.  (Defts.' Ex. D, at 70:9-13.)

Plaintiff's expert, Dr. Weinstein, opined that Dr. Altcheck's failure to physically examine and clear plaintiff for placement in ad-seg was "negligent, deficient and abusive" (pl.'s Ex. C at 4), because ad-seg is

> punitive housing in which prisoners have the least contact with staff and other inmates.  Special attention must be given to the protective role of the medical staff in providing assurance of fitness for such punishing placement.  Dr. Altcheck authorized wheelchair bound and disabled [plaintiff] to Ad-Seg with no idea what was wrong with [plaintiff] and no concern for his safety or health.

(Pl.'s Ex. C at 4.)  Dr. Weinstein notes that despite plaintiff's request for medical care while at

1  CMF by filing an administrative grievance on June 8, 2000, plaintiff received no care for his

2  acute ankle problem while housed at CMF.  (Id.)

3         Thus, genuine issues of material fact exist as to whether Dr. Altcheck was

4  deliberately indifferent to plaintiff's serious medical needs because Dr. Altcheck medically

5  cleared plaintiff for admittance to ad-seg while plaintiff had a broken ankle.  Thus, Dr.

6  Altcheck's motion for summary judgment should also be denied.

7  III.  Defendants' Motion re Pendent State Law Claims

8         In light of the above, defendants' motion that the court decline to exercise

9  jurisdiction over plaintiff's supplemental state law claims should also be denied.

10         Accordingly, IT IS HEREBY RECOMMENDED that:

11         1.  Plaintiff's November 15, 2004 motion for partial summary judgment be

12  denied.

13         2.  Defendants' March 22, 2005 motion to dismiss plaintiff's claims against

14  defendant Terhune as unexhausted be denied;

15         3.  Defendants' March 22, 2005 cross-motion for summary judgment on the

16  Eighth Amendment excessive force claims be granted as to defendants Arnold, Norris, Torres

17  and Cueva.

18         4.  Defendants' March 22, 2005 cross-motion for summary judgment on the

19  Eighth Amendment excessive force claims be denied as to defendants Gomez, Alegria, Hronek,

20  Miller, Santana, and Allen.

21         5.  Defendants' March 22, 2005 cross-motion for summary judgment on the

22  Eighth Amendment medical claims be denied as to defendants Geraghty and Altcheck.

23         6.  Defendants' motion that the court decline to exercise jurisdiction over

24  plaintiff's supplemental state law claims be denied.

25         These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 95 1 F.2d 1153 (9th Cir. 1991).

DATED:  March 6, 2006.

UNITED STATES MAGISTRATE JUDGE

/john1033.msj

28